## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Michael J. Martin,

      Plaintiff,

v.

Kansas Counselors, Inc.,

      Defendant.

Civil No.  13-2041 KHV-DJW

**PLAINTIFF'S MEMORANDUM
IN OPPOSITION OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I. STATEMENT OF MATERIAL FACTS

### A. Plaintiff's Response to Defendant's Uncontroverted Material Facts

1.      Uncontroverted.

2.      Uncontroverted.

3.      Uncontroverted.

4.      Controverted.  Despite advising Defendant Kansas Counselors, Inc.'s employee and/or agent that Michael J. Martin did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked Michael J. Martin to pay it anyway. (Ex. C, Affidavit of Michael J. Martin, para. 5; Ex. D, Haji-Karim Depo. 9/26/13 at p. 22:3-10, p. 26:20-25).

5.      Uncontroverted.

6.      Controverted.  Despite advising Defendant Kansas Counselors, Inc.'s

employee and/or agent that Michael J. Martin did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked Michael J. Martin to pay it anyway. (Ex. C, Affidavit of Michael J. Martin, para. 5; Ex. D, Haji-Karim Depo. 9/26/13 at p. 22:3-10, p. 26:20-25).

7.      Controverted.   Despite advising Defendant Kansas Counselors, Inc.'s employee and/or agent that Michael J. Martin did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked Michael J. Martin to pay it anyway. (Ex. C, Affidavit of Michael J. Martin, para. 5; Ex. D, Haji-Karim Depo. 9/26/13 at p. 22:3-10, p. 26:20-25).   Michael J. Martin then contacted the alleged original creditor (Shawnee Mission Physicians) regarding this disputed debt. (Ex. C, Affidavit of Michael J. Martin, para. 9).   The alleged original creditor (via "Stacy") insisted that this account at issue was sent to Defendant Kansas Counselors, Inc. without any social security number. (Ex. C, Affidavit of Michael J. Martin, para. 10).   Stacy called Defendant's ownership and management and insisted that Defendant Kansas Counselors, Inc. was not to further attempt to collect this alleged debt from Plaintiff. (Ex. C, Affidavit of Michael J. Martin, para. 11).

8.      Controverted.   The Shawnee Mission Physicians' debt in the amount of $136.00 appeared on Plaintiff's June 6, 2012 credit report under the entry of "Kansas Counselors".   (Ex. C, Affidavit of Michael J. Martin, para. 16).   This entry under "Kansas Counselors" also appeared on a second credit report of Plaintiffs dated October 22, 2012. (Ex. C, Affidavit of Michael J. Martin, para. 18).   When Plaintiff confronted Defendant

Kansas Counselors, Inc. with the aforementioned, Plaintiff was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under his name and an additional three or four other delinquent accounts now assigned to Plaintiff's social security number, name, date of birth, etc.  (Ex. C, Affidavit of Michael J. Martin, para. 19).  Plaintiff again contacted Shawnee Mission Physicians and they were able to verify and confirm to Plaintiff that Shawnee Mission Physicians contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon Plaintiff related to this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 20).

9.      Uncontroverted.

10.     Uncontroverted.

11.     Uncontroverted.

12.     Uncontroverted.

13.     Controverted.  The Shawnee Mission Physicians' debt in the amount of $136.00 appeared on Plaintiff's June 6, 2012 credit report under the entry of "Kansas Counselors".  (Ex. C, Affidavit of Michael J. Martin, para. 16).  This entry under "Kansas Counselors" also appeared on Plaintiff's second credit report dated October 22, 2012. (Ex. C, Affidavit of Michael J. Martin, para. 18).  When Plaintiff confronted Defendant Kansas Counselors, Inc. with the aforementioned, Plaintiff was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under his name and an additional three or four other delinquent accounts now assigned to Plaintiff's social

security number, name, date of birth, etc. (Ex. C, Affidavit of Michael J. Martin, para. 19). Plaintiff again contacted Shawnee Mission Physicians and they were able to verify and confirm to Plaintiff that Shawnee Mission Physicians contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon Plaintiff related to this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 20).

14.    Uncontroverted.

15.    Controverted. The Shawnee Mission Physicians' debt in the amount of $136.00 appeared on Plaintiff's June 6, 2012 credit report under the entry of "Kansas Counselors". (Ex. C, Affidavit of Michael J. Martin, para. 16). This entry under "Kansas Counselors" also appeared on Plaintiff's second credit report dated October 22, 2012. (Ex. C, Affidavit of Michael J. Martin, para. 18). When Plaintiff confronted Defendant Kansas Counselors, Inc. with the aforementioned, Plaintiff was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under his name and an additional three or four other delinquent accounts now assigned to Plaintiff's social security number, name, date of birth, etc. (Ex. C, Affidavit of Michael J. Martin, para. 19). Plaintiff again contacted Shawnee Mission Physicians and they were able to verify and confirm to Plaintiff that Shawnee Mission Physicians contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon Plaintiff related to this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 20).

16.    Uncontroverted.

17.    Uncontroverted.

18.    Controverted.   During a debt collection phone call in June of 2010, Defendant Kansas Counselors, Inc.'s employee and/or agent insisted that Plaintiff owed a medical debt to Shawnee Mission Physicians that had been assigned to Defendant to collect upon. (Ex. C, Affidavit of Michael J. Martin, para. 3).  Plaintiff Michael Martin did not and do not owe such a debt to Shawnee Mission Physicians. (Ex. C, Affidavit of Michael J. Martin, para. 4).

Despite advising Defendant Kansas Counselors, Inc.'s employee and/or agent that Michael J. Martin did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked Michael J. Martin to pay it anyway. (Ex. C, Affidavit of Michael J. Martin, para. 5; Ex. D, Haji-Karim Depo. 9/26/13 at p. 22:3-10, p. 26:20-25).  Michael J. Martin refused to pay Defendant Kansas Counselors, Inc. for someone else's debt. (Ex. C, Affidavit of Michael J. Martin, para. 6).

Defendant Kansas Counselors, Inc.'s employee and/or agent subsequently requested Michael J. Martin's social security number, date of birth, address, etc., in an alleged attempt to clarify whether or not Michael J. Martin was responsible for this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 7).  Michael J. Martin provided Defendant Kansas Counselors, Inc.'s employee and/or agent with the requested information. (Ex. C, Affidavit of Michael J. Martin, para. 8).

Michael J. Martin then contacted the alleged original creditor (Shawnee Mission

Physicians) regarding this disputed debt. (Ex. C, Affidavit of Michael J. Martin, para. 9). The alleged original creditor (via "Stacy") insisted that this account at issue was sent to Defendant Kansas Counselors, Inc. without any social security number. (Ex. C, Affidavit of Michael J. Martin, para. 10).  Stacy called Defendant's ownership and management and insisted that Defendant Kansas Counselors, Inc. was not to further attempt to collect this alleged debt from Plaintiff. (Ex. C, Affidavit of Michael J. Martin, para. 11).

The Shawnee Mission Physicians' debt in the amount of $136.00 appeared on Plaintiff's June 6, 2012 credit report under the entry of "Kansas Counselors".  (Ex. C, Affidavit of Michael J. Martin, para. 16).  This entry under "Kansas Counselors" also appeared on Plaintiff's second credit report dated October 22, 2012. (Ex. C, Affidavit of Michael J. Martin, para. 18).  When Plaintiff confronted Defendant Kansas Counselors, Inc. with the aforementioned, Plaintiff was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under his name and an additional three or four other delinquent accounts now assigned to Plaintiff's social security number, name, date of birth, etc.  (Ex. C, Affidavit of Michael J. Martin, para. 19).

Plaintiff again contacted Shawnee Mission Physicians and they were able to verify and confirm to Plaintiff that Shawnee Mission Physicians contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon Plaintiff related to this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 20).

**B.     Plaintiff's Statement of Additional Uncontroverted Facts**

Plaintiff hereby sets forth his Statement of Additional Uncontroverted Facts demonstrating that material factual issues preclude summary judgment for Defendant.

19.     Michael Martin received dunning and/or debt collection calls from Defendant Kansas Counselors, Inc.'s employee and/or agent in June, 2010. (Ex. C, Affidavit of Michael J. Martin, para. 2.)

20.     Kansas Counselors, Inc. attempted to collected debts from Plaintiff within the previous three years. (Ex. C, Affidavit of Michael J. Martin, para. 2, 3; Ex. D, Haji-Karim Depo. 9/26/13 at p. 38:8-15).

21.     During this phone call in June of 2010, Defendant Kansas Counselors, Inc.'s employee and/or agent insisted that Plaintiff owed a medical debt to Shawnee Mission Physicians that had been assigned to Defendant to collect upon. (Ex. C, Affidavit of Michael J. Martin, para. 3).

22.     Plaintiff Michael Martin did not and does not owe such a debt to Shawnee Mission Physicians. (Ex. C, Affidavit of Michael J. Martin, para. 4).

23.     Despite advising Defendant Kansas Counselors, Inc.'s employee and/or agent that Michael J. Martin did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked Michael J. Martin to pay it anyway. (Ex. C, Affidavit of Michael J. Martin, para. 5; Ex. D, Haji-Karim Depo. 9/26/13 at p. 22:3-10, p. 26:20-25).

24.     Michael J. Martin refused to pay Defendant Kansas Counselors, Inc. for

7

someone else's debt. (Ex. C, Affidavit of Michael J. Martin, para. 6).

25.     Defendant Kansas Counselors, Inc.'s employee and/or agent subsequently requested Michael J. Martin's social security number, date of birth, address, etc., in an alleged attempt to clarify whether or not Michael J. Martin was responsible for this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 7).

26.     Michael J. Martin subsequently provided Defendant Kansas Counselors, Inc.'s employee and/or agent with the requested information. (Ex. C, Affidavit of Michael J. Martin, para. 8).

27.     Michael J. Martin then contacted the alleged original creditor (Shawnee Mission Physicians) regarding this disputed debt. (Ex. C, Affidavit of Michael J. Martin, para. 9).

28.     The alleged original creditor (via "Stacy") insisted that this account at issue was sent to Defendant Kansas Counselors, Inc. without any social security number. (Ex. C, Affidavit of Michael J. Martin, para. 10).

29.     Stacy called Defendant's ownership and management and insisted that Defendant Kansas Counselors, Inc. was not to further attempt to collect this alleged debt from Plaintiff. (Ex. C, Affidavit of Michael J. Martin, para. 11).

30.     During telephone calls in June of 2012, Defendant Kansas Counselors, Inc.'s agents and employees alleged that Plaintiff owed additional debts, including a medical debt to Emergency Department Physicians for an Ava Martin. (Ex. C, Affidavit of Michael J. Martin, para. 12).

31.    Plaintiff does not know who Ava Martin is and is not responsible for that alleged debt.  (Ex. C, Affidavit of Michael J. Martin, para. 13).

32.    During telephone calls in June of 2012, Defendant Kansas Counselor, Inc.'s agents and employees also alleged that Plaintiff owed a debt to Johnson County Wastewater for the address of 6118 El Monte Street. (Ex. C, Affidavit of Michael J. Martin, para. 14).

33.    Plaintiff has never resided at this address (6118 El Monte Street) and does not owe a debt to Johnson County Wastewater either. (Ex. C, Affidavit of Michael J. Martin, para. 15).

34.    Plaintiff later purchased an investment property and in the process of this transaction, learned that the Shawnee Mission Physicians' debt in the amount of $136.00 appeared on Plaintiff's June 6, 2012 credit report under the entry of "Kansas Counselors". (Ex. C, Affidavit of Michael J. Martin, para. 16).

35.    This entry under "Kansas Counselors" also appeared on Plaintiff's second credit report dated October 22, 2012.  (Ex. C, Affidavit of Michael J. Martin, para. 18).

36.    When Plaintiff confronted Defendant Kansas Counselors, Inc. with the aforementioned, Plaintiff was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under his name and an additional three or four other delinquent accounts now assigned to Plaintiff's social security number, name, date of birth, etc. (Ex. C, Affidavit of Michael J. Martin, para. 19).

37.    Plaintiff again contacted Shawnee Mission Physicians and they were able to

9

verify and confirm to Plaintiff that Shawnee Mission Physicians contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon Plaintiff related to this alleged debt. (Ex. C, Affidavit of Michael J. Martin, para. 20).

38.    Kansas Counselors, Inc. performs debt collections. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 9:1-21).

39.    Kansas Counselors, Inc. attempted to collect alleged debts from Plaintiff. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 10:14-19).

40.    Kansas Counselors, Inc. attempted to collected debts from Plaintiff within the previous three years. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 11:2-6).

41.    Kansas Counselors, Inc. attempted to collected debts from Plaintiff that Plaintiff did not owe within three years from the filing of Plaintiff's lawsuit. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 11:7-13 and p. 38:8-15).

42.    Kansas Counselors, Inc. no longer wants to collect the debt allegedly owed to Shawnee Mission Physicians from Plaintiff. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 15:3-6, 16:24 – 17:1).

43.    Kansas Counselors, Inc. contacted Plaintiff in June of 2010 regarding a debt he did not owe. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 19:7-22).

44.    Kansas Counselors, Inc. has no knowledge of any facts to refute Plaintiff's allegation that Kansas Counselors, Inc. tried to collect the Shawnee Mission Physicians' debt from Plaintiff despite Plaintiff's denial that he owed it. (Ex. D, Haji-Karim Depo.

9/26/13 at p. 27:1-18).

45.     Kansas Counselors, Inc.'s policy is that Kansas Counselors, Inc. will still continue to collect debts from consumers even after the consumer apprizes Kansas Counselors, Inc. that they do not owe the debt. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 39:8 – p. 40:18).

46.     Kansas Counselors, Inc. maintains that Plaintiff owes Kansas Counselors, Inc.'s client Johnson County Wastewater money. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 45:3-22).

47.     Kansas Counselors, Inc. maintains that Plaintiff owes Kansas Counselors, Inc.'s client Emergency Department Physicians money for medical treatment provided to an Ava Martin (Ex. D, Haji-Karim Depo. 9/26/13 at p. 46:2 – 48:2).

48.     The Kansas Consumer Protection Act applies to Kansas Counselors, Inc.'s debt collection activities (Ex. D, Haji-Karim Depo. 9/26/13 at p. 74:19 – 75:5; p. 77:3-9).

49.     Kansas Counselors, Inc.'s director of operations has never reviewed the Kansas Consumer Protection Act. (Ex. D, Haji-Karim Depo. 9/26/13 at p. 77:19 – 78:9).

## STANDARD OF REVIEW

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   The party seeking summary judgment carries the burden of showing the "absence of evidence to support the

nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc*. 939 F.2d 887, 891

(10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   If "the

moving party has met its burden, the burden shifts to the nonmoving party to show that

there is a genuine issue of material fact." *Bacchus Indus*., 939 F.2d at 891.

"In asserting motions for summary judgment, both trial and appellate courts must

consider factual inferences tending to show triable issues in the light most favorable to

the existence of those issues." *Id.*   In determining whether there exists a genuine issue of

material fact, "if an inference can be deducted from the facts whereby the non-movant

could recover, summary judgment is inappropriate." *Smith v. Atlantic Richfield Co*., 814

F.2d 1481, 1488 (10th Cir. 1987).

> Credibility determinations, the weighing of evidence, and the drawing of
> legitimate inferences form the facts <u>are jury functions, not those of a judge,</u>
> whether he is ruling on a motion for summary judgment or for a directed
> verdict.   <u>The evidence of the non-movant is to be believed, and all</u>
> <u>justifiable inferences are to be drawn in his favor.</u>

*Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added).

When a defendant moves for summary judgment, "the judge must ask himself not

whether he thinks the evidence unmistakably favors one side or the other but whether a

fair-minded jury could return a verdict for the plaintiff on the evidence presented.

*Anderson*, 477 U.S. at 252, 106 S.Ct. 2512.

> It is only where it is perfectly clear that there are no issues in the case that a
> summary judgment is proper.   Even in cases where  the judge is of opinion
> that he will have to direct a verdict for one party or the other on the issues
> that have been raised, he should ordinarily hear the evidence and direct the
> verdict rather than attempt to try the case in advance on a motion for

summary judgment, which was never intended to enable the parties to evade jury trials or have the judge weigh evidence in advance of its being presented.

*Pierce v. Ford Motor Co.*, 190 F.2d 910, 915-916 (4th Cir. 1951).

Since the evidence of the nonmoving party is deemed true and all reasonable inferences are drawn in his favor, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. "Where different, ultimate inferences may be drawn from the evidence presented by the parties, the case is not appropriate for summary judgment." *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1322-23 (10th Cir. 1987). Likewise, any action examined under Rule 56, that raises real issues of credibility, motive or intent is not suitable for summary judgment, whatever the nature of the case may be. *Baum v. Gillman*, 648 F.2d 1292, 1296 (10th Cir. 1981).

## ARGUMENT

Defendant Kansas Counselors, Inc. has harassed Plaintiff for debts he does not owe since at least 2010. In response, and after unsuccessfully advising Defendant that he does not wish to pay the debts of others, Plaintiff has sued Defendant under both the Kansas Consumer Protection Act ("KCPA") and Fair Debt Collection Practices Act ("FDCPA"). Plaintiff seeks declaratory relief, statutory damages and/or civil penalties, attorney's fees and costs.

## A.   DEFENDANT VIOLATED THE FDCPA

13

Whether Defendant violated the FDCPA is a question of law for the Court under the "least sophisticated consumer" standard. *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 237-38 (2d Cir. 1998), citing *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) and *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62-63 (2d Cir. 1993).

Summary judgment is inappropriate because pursuant to the uncontroverted facts, Plaintiff meets the essential three requirements to establish an FDCPA violation: (1) the Plaintiff is the consumer who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt, (2) the Defendant collecting the "debt" is a "debt collector" as defined under the FDCPA, and (3) the Defendant has engaged in acts or omissions in violation of the prohibitions or requirements of the law. *Kolker v. Duke City Collection Agency*, 750 F. Supp. 468, 469 (D.N.M. 1990); *Riveria v. MAB Collections, Inc.*, 682 F. Supp. 174, 175-76 (W.D.N.Y. 1988); *Withers v. Eveland*, 988 F. Supp. 942, 945 (E.D. Va. 1997); *Whatley v. Universal Collection Bureau, Inc.*, 525 F. Supp. 1204, 1206 (N.D.Ga. 1981).

The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 318-19 (8th Cir. 2004). *See also Duffy v. Landberg*, 215 F.3d 871, 874 (8th Cir. 2000). The focus of the FDCPA is on the conduct of the debt collector, not on the conduct of the consumer. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

14

The FDCPA is a strict liability statute. *See Cordes v. Frederick J. Hanna & Associates, P.C.*, 789 F. Supp. 2d 1173 (D. Minn. 2011). Proof of only one violation is sufficient to support judgment for plaintiff. *Bentley v. Great Lakes Collection Bureau, Inc.*, 6 F.3d 60 (2d Cir. 1993).

The FDCPA is liberally construed in favor of the consumer to effectuate its purposes. *Cirkot v. Diversified Financial Systems, Inc.*, 839 F. Supp. 941, 944 (D. Conn. 1993). The standard used to determine whether something is deceptive or misleading is whether the "least sophisticated consumer" could have been deceived or misled. *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d. Cir. 1993). The "least sophisticated consumer" is a naive, credulous, gullible, ignorant, unthinking, person of "below-average sophistication or intelligence" "with a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Id.*

Debt collection activities are deceptive or misleading if it is subject to an inaccurate yet reasonable interpretation by the least sophisticated consumer. *Russell v. Equifax A.R.S.*, 74 F.3d 30, 36 (2d Cir. 1996); *See also Duffy v. Landberg*, 215 F.3d 871, 874 (8th Cir. 2000). Whether a debt collection activity is deceptive or misleading from the perspective of the least sophisticated consumer is ordinarily a question of law for the Court, where a defendant has not conceded liability. *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 237 38 (2d Cir. 1998), citing *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) and *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62-63 (2d Cir. 1993).

**PLAINTIFF IS A CONSUMER AND THE ALLEGED DEBTS ARE SUBJECT TO**

**THE FDCPA**

The term "consumer" means any natural person obligated or allegedly obligated to pay any debt. 15 U.S.C. §1692(a)(3).  It is uncontroverted that Plaintiff is a "consumer" under the FDCPA. SOF 19, 20, 21, 23, 30, 32, 34, 35, 39, 40, 41, 43 and 44.

The term "debt" means any alleged obligation of a consumer to pay money arising out of a transaction in which the services which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. §1692(a)(5).  Further, it is uncontroverted that the subject debts are "debt[s]" is defined under the FDCPA. SOF 19, 20, 21, 23, 30, 32, 34, 35, 39, 40, 41, 43 and 44.

**DEFENDANT IS A DEBT COLLECTOR**

A "debt collector" is "any person who uses an instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15  U.S.C. §1692a(6).  Moreover, it is uncontroverted that defendant is a debt collector under the FDCPA. SOF 19, 20, 21, 23, 30, 32, 34, 35, 38, 39, 40, 41, 43 and 44.

**THE VIOLATIONS OF THE FDCPA**

Defendant's violations of the FDCPA, include, but are not limited to, the following:

> (a)     engaging in conduct that had the natural consequence to harass, oppress and/or abuse Plaintiff in connection with the collection of a debt (15 U.S.C. § 1692d ); and

16

(b)     making false, deceptive, and misleading representations and collection means in connection with the collection of a debt (15 U.S.C. § 1692e ); and

(c)     misrepresenting the legal status of a debt (15 U.S.C. § 1692e(2(A)); and

(d)     the use of false representations or deceptive means to collect or attempt to collect any debt  (15 U.S.C. § 1692e(10) ); and

(e)     utilizing unfair or unconscionable means to collect or attempt to collect a debt  (15 U.S.C. § 1692f ); and

(f)     communicating to any person credit information which is known or should be known to be false, including the failure to communicate that a disputed debt is disputed (15 U.S.C. § 1692e(8)).


The legislative history of the FDCPA indicates that Congress intended to address the very situation alleged by Plaintiff.  A Senate Report states that the purpose of the Act is to "eliminate the recurring of debt collectors dunning the wrong person..." S. Rpt. 95-382 at 4, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699.   A House Report noted congressional intent to regulate collection activities based on either "mistaken identity or mistaken facts." H.R. Rep. No. 131, at 8. Congress recognized that computer errors are a related problem, and that "[c]onsumers who are victims of computer error find it extremely difficult to obtain correction of records.  This may lead to collection agency harassment." *Id. see also Barany-Snyder v. Weiner*, 539 F.3d 327, 333 (6th Cir. 2008) ("[T]he FDCPA is extremely broad, crafted in response to what Congress perceived to be a widespread problem." (citations omitted).

Specifically, during telephone calls in June of 2012, Defendant Kansas

17

Counselors, Inc.'s agents and employees alleged that Plaintiff owed additional debts, including a medical debt to Emergency Department Physicians for an Ava Martin. SOF 30. Plaintiff does not know who Ava Martin is and is not responsible for that alleged debt. SOF 31.

During telephone calls in June of 2012, Defendant Kansas Counselor, Inc.'s agents and employees also alleged that Plaintiff owed a debt to Johnson County Wastewater for the address of 6118 El Monte Street. SOF 32. Plaintiff has never resided at this address (6118 El Monte Street) and does not owe a debt to Johnson County Wastewater either. SOF 33.

Plaintiff later purchased an investment property and in the process of this transaction, learned that the Shawnee Mission Physicians' debt in the amount of $136.00 appeared on Plaintiff's June 6, 2012 credit report under the entry of "Kansas Counselors". SOF 34. This entry under "Kansas Counselors" also appeared on Plaintiff's second credit report dated October 22, 2012. SOF 35. In *Brady v. Credit Recovery Company*, the First Circuit held that 15 U.S.C. § 1692e(8) requires a debt collector to report a debt is disputed if it has reason to know it is disputed. 160 F.3d 64 (1st Cir. 1998). The *Brady* opinion also holds that a dispute need not be in writing for this requirement to apply. *Id.* at 66 ("[c]learly, the ordinary usauge of 'dispute' does not contemplate a writing"). 15 U.S.C. § 1692e(8) requires a debt collector report the dispute when communicating with a credit reporting agency. *Randall v. Midland Funding, L.L.C.*, 2009 WL 2358350 (D. Neb. July 23, 2009); *See also Finnegan v. University of*

18

*Rochester Med. Ctr.*, 21 F.Supp. 2d 223 (W.D.N.Y. 1998) (allegations that debt collector continued to attempt to collect an orally disputed debt and failed to communicate dispute to credit reporting agency stated claim for relief under the FDCPA).

When Plaintiff confronted Defendant Kansas Counselors, Inc. in 2012 with the fact that his credit reports still depicted the Kansas Counselor's entry(s), Plaintiff was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under his name and an additional three or four other delinquent accounts now assigned to Plaintiff's social security number, name, date of birth, etc. SOF 36. Plaintiff again contacted Shawnee Mission Physicians and they were able to verify and confirm to Plaintiff that Shawnee Mission Physicians contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon Plaintiff related to this alleged debt. SOF 37.

Nonetheless, Kansas Counselors, Inc.'s policy is to continue to collect debts from consumers even after the consumer apprizes Kansas Counselors, Inc. that they do not owe the debt. SOF 45. Kansas Counselors, Inc. maintains that Plaintiff owes Kansas Counselors, Inc.'s client Johnson County Wastewater money. SOF 46. Kansas Counselors, Inc. maintains that Plaintiff owes Kansas Counselors, Inc.'s client Emergency Department Physicians money for medical treatment provided to an Ava Martin SOF 47. Defendant has violated the FDCPA.

19

## B.   DEFENDANT VIOLATED THE KCPA

The Kansas Supreme Court has previously held that debt collection activities are subject to the provisions of the KCPA if three conditions are satisfied:

(1) The debt sought to be enforced came into being as a result of the consumer transaction;

(2) The parties to the original consumer transaction were a "supplier" and a "consumer" as defined by the act; and

(3) The conduct complained of, either deceptive or unconscionable, occurred during the collection of, or an attempt to collect, a debt which arose from the consumer transaction and was owed to the original supplier.

*State ex rel. Miller v. Midwest Serv. Bur. of Topeka, Inc.*, 229 Kan. 322, 329, 623 P.2d 1343, 1349 (1981).

In this case, it is uncontroverted that the KCPA applies to Kansas Counselors, Inc.'s debt collection activities. SOF 48.   Nonetheless, Kansas Counselors, Inc.'s director of operations has never reviewed the Kansas Consumer Protection Act. SOF 49.

Defendant Kansas Counselors, Inc. has repeatedly attempted to collect debts from Plaintiff that Plaintiff did not owe within three years from the filing of Plaintiff's lawsuit. SOF 41.   Specifically, Kansas Counselors, Inc. contacted Plaintiff in June of 2010 regarding a debt he did not owe. SOF 43.   Despite advising Defendant Kansas Counselors, Inc.'s employee and/or agent that Michael J. Martin did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked Michael J. Martin to pay it anyway. SOF 23.   Further, during telephone calls in June of 2012, Defendant Kansas Counselors, Inc.'s agents and employees alleged that Plaintiff owed additional debts, including a medical debt to Emergency Department

20

Physicians for an Ava Martin. SOF 30.  Plaintiff does not know who Ava Martin is and is not responsible for that alleged debt. SOF 31.

During telephone calls in June of 2012, Defendant Kansas Counselor, Inc.'s agents and employees also alleged that Plaintiff owed a debt to Johnson County Wastewater for the address of 6118 El Monte Street. SOF 32.  Plaintiff has never resided at this address (6118 El Monte Street) and does not owe a debt to Johnson County Wastewater either. SOF 33.  Kansas Counselors, Inc.'s policy is to continue to collect debts from consumers even after the consumer apprizes Kansas Counselors, Inc. that they do not owe the debt. SOF 45.  This policy has caused Plaintiff Michael Martin to be abused and harassed by Defendant for alleged debts he does not owe for years (since 2010) – all in violation of the KCPA.

WHEREFORE, Plaintiff Michael J. Martin respectfully prays that Defendant Kansas Counselors, Inc.'s Motion for Summary Judgment be denied, that judgment be entered in favor of Plaintiff, and for such other and further relief as the Court deems just and necessary.

Respectfully submitted,

By: /s/ A. Scott Waddell
A. Scott Waddell      KS# 20955
Waddell Law Firm LLC
2029 Wyandotte, Suite 100
Kansas City, Missouri 64108
Telephone: 816.221.2555
Facsimile:  816.221.2508
scott@aswlawfirm.com
Attorney for Plaintiff

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was electronically filed with this Court and a copy served through the Court's electronic filing system to all counsel of record in the subject matter on February 24, 2014.

By: /s/ A. Scott Waddell, Attorney for Plaintiff

22

# Exhibit C

# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

---

Michael J. Martin,

      Plaintiff,

v.

Kansas Counselors, Inc.,

      Defendant.

Civil No.  13-2041 KHV-DJW

**AFFIDAVIT**

---

## AFFIDAVIT OF MICHAEL J. MARTIN

1.     My name is Michael J. Martin and I am a resident of Overland Park, Johnson County, Kansas.

2.     I received dunning and/or collection calls from Defendant Kansas Counselors, Inc.'s employee and/or agent in June, 2010.

3.     During this phone call in June of 2010, Defendant Kansas Counselors, Inc.'s employee and/or agent insisted that I owed a medical debt to Shawnee Mission Physicians that had been assigned to Defendant to collect upon.

4.     I did not and do not owe such a debt to Shawnee Mission Physicians.

5.     Despite advising Defendant Kansas Counselors, Inc.'s employee and/or agent that I did not owe any debt to Shawnee Mission Physicians, Defendant Kansas Counselors, Inc.'s employee and/or agent asked me to pay it anyway.

6.      I refused to pay Defendant Kansas Counselors, Inc. for someone else's debt.

7.      Defendant Kansas Counselors, Inc.'s employee and/or agent subsequently requested my social security number, date of birth, address, etc., in an alleged attempt to clarify whether or not I was responsible for this alleged debt.

8.      I subsequently provided Defendant Kansas Counselors, Inc.'s employee and/or agent with the requested information.

9.      I then contacted the alleged original creditor (Shawnee Mission Physicians) regarding this disputed debt.

10.     The alleged original creditor (via "Stacy") insisted that this account at issue was sent to Defendant Kansas Counselors, Inc. without any social security number.

11.     Stacy called Defendant's ownership and management and insisted that Defendant Kansas Counselors, Inc. was not to further attempt to collect this alleged debt from me.

12.     During telephone calls in June of 2012, Defendant Kansas Counselors, Inc.'s agents and employees alleged that I owed additional debts, including a medical debt to Emergency Department Physicians for an Ava Martin.

13.     I do not know who Ava Martin is and is not responsible for that alleged debt.

14.     During telephone calls in June of 2012, Defendant Kansas Counselor, Inc.'s agents and employees also alleged that I owed a debt to Johnson County Wastewater for

2

the address of 6118 El Monte Street.

15.    I have never resided at this address (6118 El Monte Street) and do not owe a debt to Johnson County Wastewater either.

16.    I later purchased an investment property and in the process of this transaction, learned that the Shawnee Mission Physicians' debt in the amount of $136.00 appears on my June 6, 2012 credit report under the entry of "Kansas Counselors".

17.    This credit report is attached as Exhibit C-1.

18.    This entry under "Kansas Counselors" also appeared on a second credit report of mine dated October 22, 2012.

19.    When I confronted Defendant Kansas Counselors, Inc. with the aforementioned, I was told Defendant Kansas Counselors, Inc. still had the Shawnee Mission Physicians' account under my name and an additional three or four other delinquent accounts now assigned to my social security number, name, date of birth, etc.

20.    I again contacted Shawnee Mission Physicians and they were able to verify and confirm to me that they contacted Defendant Kansas Counselors, Inc. back in October 2010 and instructed Kansas Counselors, Inc. to halt collecting upon me related to this alleged debt.

FURTHER AFFIANT SAYETH NAUGHT.

MICHAEL J. MARTIN

I, _Rachel Mason_ , do solemnly affirm under the penalty of perjury, that Michael J. Martin, personally known to me, has executed the within Affidavit in my presence, and has acknowledged to me that he executed the same for the purposes therein stated and requested that I sign my name on the within document as an executing witness.

STATE OF _Missouri_ )
                     ) ss:
COUNTY OF _Jackson_ )

Before me this _21st_ day of _February_ , 2014, came Michael J. Martin, and knowingly and freely executed the above as executing witness.

RACHEL MASON
Notary Public, Notary Seal
State of Missouri
Commission # 07360197

NOTARY PUBLIC

My Commission Expires: _11-13-15_

4

## APPLICANT

| | |
|---|---|
| **NAME:** MICHAEL J MARTIN | |
| **S.S.N :** 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 | **Date Received:** 06/06/12 |

### PUBLIC RECORD INFORMATION

NO PUBLIC RECORDS FOUND

### CREDIT HISTORY

| E C O A | CREDITOR ACCOUNT NO | RPTD | LAST ACT. | OPND | LIMIT OR HIGHEST CREDIT | BALANCE OWING | AMOUNT PAST DUE | TERMS PYMT AMT | TYPE/RATE VENDOR | NO MOS HIST REV | 30 DAYS | 60 DAYS | 90 DAYS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | GMAC MORT. #602745501 3461 HAMMOND AVE WATERLOO IA 50704 (800) 766-4622 | 04/12 | 04/12 | 07/10 | 394723 | 349670 | 0 | 360 M 2432 | MTG 01 REAL ESTATE TRU 01 (EFX,XPN) | 21 | 0 111111111111 1111111 | 0 | 0 |
| | FANNIE MAE ACCOUNT CONVENTIONAL REAL ESTATE MORTGAGE | | | | | | | | | | | | |
| B | AES/GOALFN #728136851PA00001 (800) 233-0555 | 05/12 | 05/12 | 03/04 | 21345 | 20162 | | 131 | INS 01 EDUCATIONAL LN EFX 01 (XPN,TRU) | 4 | 0 | 0 | 0 |
| B | AMEX #349991624731691 (800) 874-2717 | 05/12 | 06/12 | 10/08 | 10168 | 9704 | | 97/4E | OPN 01 CREDIT CARD EFX 01 (XPN,TRU) 02/12 2 | 9 | 1 111121111111 111111111111 | 0 | 0 |
| B | CITI #546616031107 PO BOX 6241 SIOUX FALLS SD 57117 BYMAILONLY | 06/12 | 05/12 | 07/07 | 10960 | 8687 | | V 130 | REV 01 XPN 01 (EFX,TRU) | 59 | 0 111111111111 111111111111 | 0 | 0 |
| | FLEXIBLE SPENDING CREDIT CARD | | | | | | | | | | | | |
| J | BANK OF AMERICA, N.A. #63010024330007 201 N TRYON ST CHARLOTTE NC 28202 BYMAILONLY | 05/12 | 05/12 | 06/10 | 10519 | 6856 | | 60 M 212 | INS 01 AUTO XPN 01 (EFX,TRU) | 23 | 0 111111111111 11111111111 | 0 | 0 |
| B | AES/GOALFN #728136851PA00002 (800) 233-0555 | 05/12 | 05/12 | 03/04 | 19620 | 3967 | | 26 | INS 01 EDUCATIONAL LN EFX 01 (XPN,TRU) | 4 | 0 | 0 | 0 |
| B | CAP ONE #414709759384 (804) 967-1000 | 05/12 | 05/12 | 04/10 | 5000 | 3728 | 0 | V 80 | REV 01 TRU 01 (EFX,XPN) 12/11 2 | 25 | 1 111112111111 111111111111 | 0 | 0 |
| | FLEXIBLE SPENDING CREDIT CARD | | | | | | | | | | | | |
| | KANSAS COUNSELORS OF K #104106000251461? PO BOX 14765 SHAWNEE MISSION KS 66285 (913) 541-9925 | 10/10 | | 08/10 | 136 | 136 | 136 | 1 M 136E | INS 09 COLLECTION ATTY XPN 01 10/10 9 | 1 9 | 0 | 0 | 0 |
| | COLLECTION MEDICAL PAYMENT DATA | | | | | | | | | | | | |
| J | AHF #110504605 (972) 929-1566 | 05/12 | 10/11 | 08/08 | 21285 | 0 | | 426 | INS 01 AUTO EFX 01 (XPN,TRU) | 44 | 0 | 0 | 0 |
| | CLOSED OR PAID ACCOUNT – ZERO BALANC | | | | | | | | | | | | |
| J | AHM #34641957 (800) 542-6632 | 02/11 | 08/08 | 07/03 | 29287 | 0 | | 608 | INS 01 AUTO EFX 01 (XPN,TRU) | 90 | 0 | 0 | 0 |
| | CLOSED OR PAID ACCOUNT – ZERO BALANC | | | | | | | | | | | | |

**EXHIBIT C-1**

ALL-STATE LEGAL®

PAGE 2                                                                 ( 2 of 8 )

# Exhibit D



**Appino & Biggs** Reporting Service, Inc.

Technology Specialists in Complex Litigation

# Transcript of

# **CAMERON HAJI-KARIM**

**Date:**   09/26/2013

**Case:**   MICHAEL J. MARTIN vs. KANSAS COUNSELORS, INC.

in Office)
5W 21st Street
eka, KS 66604
.273.3063

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

www.AppinoBiggs.com

9/26/2013                    **CAMERON HAJI-KARIM**                              3

---

Page 9

1    A.  We handle their account receivable.
2    Q.  Okay.  You collect debts from people that
3  owe your clients money?
4    A.  Sure.
5    Q.  Okay.  Are you denying that Kansas
6  Counselors is a debt collector?
7        MR. KLUTHO:  Counsel, I'm just saying
8  that it's a, you're asking him a legal conclusion.
9  BY MR. WADDELL:
10   Q.  You can answer it.
11       MR. KLUTHO:  He's not a lawyer.
12   Q.  You're the director of operations, right?
13 You don't know whether or not Kansas Counselors is
14 a debt collector; is that your testimony to this
15 jury?
16   A.  I think what I'm trying -- I didn't even
17 answer the question yet.
18   Q.  Well, you can answer it.  I want you to
19 answer the question, so I can move on to some more
20 substantive topics.
21   A.  We do perform debt collections, yes.
22   Q.  Do you know within the three years
23 previous to the filing of this lawsuit on December
24 27th of 2012, whether Kansas Counselors, Inc. ever
25 attempted to collect a debt from my client,

Page 10

1  Michael J. Martin?
2    A.  I'm -- without having the information in
3  front of me, I couldn't give you a definite answer
4  about that.
5    Q.  Well, one of the topics contained within
6  the designation today asked for a witness that
7  would have that information.  Is that not you?
8        MR. KLUTHO:  Well, Counsel, that's not
9  what your topic says, but asked for, so that's an
10 improper question.
11       MR. WADDELL:  We can look at that here in
12 a little bit.
13       BY MR. WADDELL:
14   Q.  Do you know who within the organization
15 would have knowledge about who collected debts
16 within the previous three years from my client?
17   A.  Well, we did collect debts from your
18 client previously, but if you're asking for
19 specific dates, I don't have those memorized.
20   Q.  Okay.  What -- what witness within your
21 organization would have that information?
22   A.  Memorized?
23   Q.  Or just knowledge of it generally?
24   A.  Well, I would have knowledge of it if I
25 had the actual notes, I could talk about specific

Page 11

1  dates.
2    Q.  Okay.  As you sit here today, do you know
3  whether or not in the previous three years Kansas
4  Counselors, Inc. ever made collection calls to my
5  client?
6    A.  I believe they did, yes, that's correct.
7    Q.  Okay.  Do you know whether in the
8  previous three years of the filing of this lawsuit
9  Kansas Counselors, Inc. ever made debt collection
10 calls to my client about debts that he does not in
11 fact owe?
12   A.  I believe that did happen, yes, that's
13 correct.
14   Q.  All right.  Are you aware of whether or
15 not any calls were made to my client in June 2010
16 regarding an alleged debt?
17   A.  Well, once again, without having the
18 notes, I wouldn't be able to clearly tell you the
19 exact date.
20   Q.  Okay.  Who within your organization would
21 have that information?
22   A.  Well, anyone that would have access to
23 the notes.
24   Q.  Okay.  Do you have any reason to dispute
25 my client's allegation that in June of 2010 your

Page 12

1  organization or some of your employees or agents
2  called him about a debt, regarding a debt owed to
3  Shawnee Mission Physicians?
4    A.  Once again, without the notes, I wouldn't
5  be able to confirm or deny that.
6    Q.  Okay.  Are you aware that one of the
7  allegations and counts within my client's lawsuit
8  is for declaratory judgment that Kansas Counselors
9  be precluded from collecting that alleged debt
10 from my client any further?
11   A.  For the Shawnee Mission E.R. Physicians?
12   Q.  Yes.
13   A.  And where is that on the page?
14   Q.  It's the Count Six Declaratory Judgment
15 on page 9.
16       MR. KLUTHO:  Counsel, you're asking him a
17 question that's outside the scope of what you've
18 asked this witness to be here for.
19       MR. WADDELL:  I think the pleadings are
20 within the scope.
21       MR. KLUTHO:  And where is that Counsel?
22       MR. WADDELL:  I don't have the
23 designation with me.
24       MR. KLUTHO:  I have it right here --
25       MR. WADDELL:  May I see it?



**(Main Office)**
Topeka, KS
785.273.3063

**Appino & Biggs**
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free:  888.273.3063
www.appinobiggs.com

**(Metro Kansas City)**
Overland Park, KS
913.383.1131

Page 13

1  MR. KLUTHO: -- that's what we are here
2  to talk about.
3  MR. WADDELL: Well, it says the factual
4  basis for defendant's answer. So the answers in
5  response to the petition.
6  MR. KLUTHO: You're talking about a
7  declaratory judgment.
8  MR. WADDELL: Right. Can you go ahead
9  and mark that as Exhibit 2, please?
10  (THEREUPON, Haji-Karim Deposition Exhibit
11  No 2 was marked for identification.)
12  MR. KLUTHO: Do you have copies of that?
13  MR. WADDELL: I don't. It's your
14  pleading.
15  BY MR. WADDELL:
16  Q. Can you take a look at Exhibit 2, please?
17  MR. KLUTHO: Here is mine. Can I have my
18  notice back?
19  BY MR. WADDELL:
20  Q. Ready?
21  A. (Witness nodding.)
22  Q. Okay. Have you seen Deposition Exhibit
23  No. 2 before?
24  A. Yes, I have.
25  Q. When did you first see that document?

Page 14

1  A. I don't remember the exact date, but I do
2  remember seeing it.
3  Q. Can I see it real quick?
4  A. (The witness complied.)
5  Q. I'm going to read the response to Count
6  Six, and I want you to tell me if there's any part
7  I'm misreading.
8  MR. KLUTHO: Counsel, you don't need to
9  do that. It'll speak for itself.
10  BY MR. WADDELL:
11  Q. In response to Paragraph 44 of
12  Plaintiff's Petition including all its subparts
13  and prayer for relief, Defendant KCI denies the
14  allegations contained therein and alleges to the
15  extent the allegations constitute legal
16  conclusions, no response is required.
17  My question is this: Is Kansas Counselors,
18  Inc. taking the position that they still want to
19  collect this alleged debt from my client today?
20  MR. KLUTHO: I'll object to the question.
21  You said you were going to read the response to
22  Count Six, and then you read two paragraphs, and
23  there's multiple paragraphs beyond that.
24  But you can answer that question, if you want
25  to.

Page 15

1  A. Can you restate the question?
2  BY MR. WADDELL:
3  Q. Sure. Does Kansas Counselors, Inc. still
4  want to collect this alleged debt from my client
5  as we sit here today?
6  A. No, we do not.
7  Q. Do you have any opposition to the Kansas
8  District Court declaring that my client does not
9  owe that debt?
10  A. I don't understand the question.
11  Q. Sure.
12  A. Can you repeat it one more time?
13  Q. One of the prayers for relief we've asked
14  the District Court to provide us, is that Kansas
15  Counselors no longer collect this alleged debt to
16  Shawnee Mission Physicians. And you denied that
17  relief in Kansas Counselors' Answer. And I just
18  want to know today, is Kansas Counselors still
19  taking the position that they want to continue
20  collecting this alleged debt to Shawnee Mission
21  Physicians from my client?
22  MR. KLUTHO: Counsel, I'm going to object
23  to the form of the question.
24  BY MR. WADDELL:
25  Q. Okay. You can answer.

Page 16

1  A. I'm still kind of confused. What part in
2  there is it saying that we're not wanting to do
3  relief?
4  Q. Denies the allegations contained therein.
5  A. And what --
6  Q. In paragraph 28.
7  A. Paragraph 28 of the --
8  Q. Yep.
9  A. And where does that 28 draw back to on
10  the actual Petition --
11  Q. Page 10, paragraph 44 of the Petition.
12  MR. KLUTHO: Counsel, with respect to the
13  question, that Answer, paragraph 28, was prepared
14  by KCI's law firm. This counsel (sic) is not an
15  attorney, and calls for a legal conclusion as the
16  --
17  MR. WADDELL: Okay.
18  MR. KLUTHO: -- response indicates. And
19  I object to your question of trying to get this
20  witness to be a lawyer --
21  MR. WADDELL: Okay.
22  MR. KLUTHO: -- which he's not.
23  BY MR. WADDELL:
24  Q. Does Kansas Counselors still want to
25  collect this debt from my client today?


Appino & Biggs
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free: 888.273.3063
www.appinobiggs.com

(Main Office)
Topeka, KS
785.273.3063

(Metro Kansas City)
Overland Park, KS
913.383.1131

Page 17

1    A.  No, it does not.
2    Q.  Okay.  Did you ever get to see the Second
3  Amended Notice to take Videotaped Deposition
4  served upon your attorneys in this matter?
5    A.  Without looking at it, I couldn't tell
6  you honestly.  Oh, yes.
7    Q.  May I have that back?
8    A.  Sure.
9    Q.  One of the topic areas inquired, or asked
10  to be inquired about is, The factual basis for
11  Defendant's Answer and affirmative Defenses to
12  Plaintiff's claims.  That's under No. 3.  Do you
13  see that?
14    A.  Yes.
15    Q.  Okay.  Are you capable of providing that
16  testimony today?
17    A.  Factual debt?
18    Q.  Yes.
19    A.  Yes, I am.
20    Q.  Okay.  What about, Defendant's collection
21  attempts upon Plaintiff, No. 4?
22    A.  Yes, I could also talk about that if I
23  had the actual specific notes, if you're asking
24  about specific dates.
25    Q.  Well, see, the rules in Kansas require

Page 18

1  you to be prepared to do that already when you sit
2  in that chair.
3    MR. KLUTHO:  Counsel, I'm going to object
4  that that's argumentative.  This individual --
5    MR. WADDELL:  We'll take it up with the
6  judge.  We'll take it up with the judge.
7    MR. KLUTHO:  Let me finish my objection,
8  please.
9    MR. WADDELL:  Go ahead.  It's object to
10  form, and that's it.  We don't have these running
11  objections in Kansas.
12    MR. KLUTHO:  That's argumentative.  He's
13  indicated, if you give him the records, he'll talk
14  about them.  He does not -- he has not memorized
15  the records, Counsel.
16    BY MR. WADDELL:
17    Q.  Did you do any review of the records in
18  preparation for today's deposition?
19    A.  No, I did not.
20    Q.  What did you do in preparation for
21  today's deposition?
22    A.  As far as preparation?
23    Q.  Yeah.  The rules require you to be
24  prepared today, so I don't waste a lot of money
25  for your deposition.  And it seems like you're

Page 19

1  unprepared if you haven't reviewed any records.
2    MR. KLUTHO:  I'm going to object.  It's
3  argumentative, Counsel.  He has reviewed all of
4  the records.  You're asking him about did he
5  review them today.  No, he has not.
6    BY MR. WADDELL:
7    Q.  Okay.  Well, let's go back to this.  Do
8  you agree that one of your collectors within
9  Kansas Counselors contacted my client in June of
10  2010 about a debt he did not owe?
11    A.  Well, if you're wanting me to talk about
12  specific dates, I can't do that, without having
13  the notes in front of me.  But we did make contact
14  with your client.
15    Q.  Okay.  Do you have any facts within your
16  purview to help you deny that debt collection
17  calls were placed to my client in June of 2010 for
18  a debt my client does not owe?
19    A.  Well, once again, you're talking about
20  specific dates.  And I already have answered that
21  we did make calls to your clients on debts that he
22  owed, and also on debts that he did not owe.
23    Q.  Okay.  Which ones -- which debts did my
24  client not owe did he receive contacts about?  Do
25  you know that?

Page 20

1    A.  Well, I believe it was the Shawnee
2  Mission E.R. Physicians.
3    Q.  Okay.  Do you believe that the Shawnee
4  Mission E.R. Physicians' alleged debt is the only
5  debt your organization contacted my client about
6  that he does not, in fact, owe?
7    A.  I believe that is correct, yes.
8    Q.  Okay.  Okay.  Do you know the identity of
9  individuals, employees and agents of your company
10  that engaged in collection activities upon my
11  client?
12    A.  I do.
13    Q.  Who are those people?
14    A.  Who are the people?
15    Q.  Yes.  That entity?
16    A.  That actually spoke to the client?
17    Q.  To my client, yes.
18    A.  Well, I know of one person off of memory.
19  But once again, without the notes in front of me,
20  I wouldn't be able to specifically give you each
21  name and recall the dates and times of the
22  conversation.
23    Q.  Let's try the one person you do remember.
24    A.  It was John Lavar.
25    Q.  Is John Lavar still with your



Appino & Biggs
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free:  888.273.3063
www.appinobiggs.com

(Main Office)
Topeka, KS
785.273.3063

(Metro Kansas City)
Overland Park, KS
913.383.1131

Page 21

1  organization?
2      A.  Yes, he is.
3      Q.  Okay.  When did John Lavar participate in
4  a debt collection activity against my client?
5      A.  I wouldn't know the specific dates.  I
6  don't have that memorized, sir.
7      Q.  Was it in the last five years?
8      A.  I would say within the last five years is
9  a safe assessment, yes.
10     Q.  How about within the last three years of
11 the filing of this lawsuit?
12     A.  I wouldn't know specifically.  And I want
13 to be sure I'm factual, so I don't know
14 specifically.
15     Q.  Do you think John would know?
16     A.  If he had the notes in front of him, he
17 probably would.
18     Q.  Have you talked to John about the debt
19 collection calls me made to my client?
20     A.  No, I have not.
21     Q.  Do you have the ability to provide
22 information about any investigations performed by
23 your company upon my clients disputing of owing
24 any debt on the Shawnee Mission Physicians
25 account?

Page 22

1      A.  Disputing it.  Can you clarify that?  I
2  don't understand.
3      Q.  Yeah.  My — my understanding is that my
4  client's alleging that in June of 2010, he told
5  one of your collectors that he does not in fact
6  owe Shawnee Mission Physicians any money.
7      A.  Okay.
8      Q.  Do you have any information or knowledge
9  about that?
10     A.  I believe that did happen, yes.
11     Q.  Okay.  And you would agree that up into
12 2012 an account with Shawnee Mission Physicians
13 still lied with my client, even though he didn't
14 owe it, true?
15     MR. KLUTHO:  I don't understand your
16 question.  Object to the form.
17     A.  I don't understand the question either.
18 I'm sorry.
19     BY MR. WADDELL:
20     Q.  Can I see Exhibit 2, please.  That's the
21 Answer.
22     A.  That's Exhibit 1.  This must be No. 2.
23     Q.  I want to talk about some of the
24 affirmative defenses alleged in this case.  Your
25 lawyers allege that my client's claims are barred

Page 23

1  in whole or in part by the equitable doctrines of
2  estoppel and waiver.  Do you know of any facts
3  that support those legal theories?
4      A.  I don't know how to answer that question.
5  I don't even understand it.
6      Q.  Who within your organization would have
7  facts about that issue?
8      A.  About how to answer that question?
9      Q.  Yes.
10     A.  I would have no idea.
11     Q.  You realize that's one of the topic areas
12 that we identified for your deposition today?
13     MR. KLUTHO:  Counsel, you realize you're
14 being argumentative with the witness?  This is a
15 legal answer that I've put in there.
16     MR. WADDELL:  I'm allowed to find out
17 facts that support affirmative defenses.
18     MR. KLUTHO:  Don't argue with the
19 witness.
20     MR. WADDELL:  I'm allowed to find out
21 facts that support affirmative defenses.  That's
22 one of the topic areas of my designation.
23     MR. KLUTHO:  I understand that's one of
24 your topic areas --
25     MR. WADDELL:  And he's acknowledging that

Page 24

1  he has no facts to support the affirmative
2  defenses enumerated in paragraph 31.
3      MR. KLUTHO:  Fine.  Move on.
4      BY MR. WADDELL:
5      Q.  Okay.  One of the affirmative defenses
6  your lawyers and your company has alleged is that
7  my client has failed to mitigate his damages.  Can
8  you tell me all the facts that support that theory
9  that my client has failed to mitigate his damages?
10     A.  Define mitigate for me.
11     Q.  It's your affirmative defense, not mine?
12     A.  Are you talking about how he has not
13 identified where his damages lie?
14     Q.  No, that's not what mitigate means.
15     A.  Okay.
16     Q.  It's -- it's your Answer, not mine.
17     A.  So rephrase your question, please.
18     Q.  Well, okay.  The Affirmative Defense
19 reads, paragraph 33, Plaintiff has failed to
20 mitigate his damages.  And I want to know from
21 Kansas Counselors, Inc. what facts support that
22 allegation?
23     A.  Well, in his petition, there was nothing
24 in there specifically talked about what damages
25 were caused.



Appino & Biggs
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free:  888.273.3063
www.appinobiggs.com

(Main Office)          (Metro Kansas City)
Topeka, KS             Overland Park, KS
785.273.3063           913.383.1131

Page 25

1    Q.  That's a completely different issue than
2  failure to mitigate.  You understand that?
3    A.  No, I don't.
4    Q.  Okay.  Did your lawyers prepare you to
5  answer any of these questions regarding your
6  affirmative defenses in this matter?
7       MR. KLUTHO:  Do not talk about what you
8  talked about with your lawyers.  Objection.
9  BY MR. WADDELL:
10    Q.  Have you been prepared to talk about any
11  of the affirmative defenses in this case?
12    A.  Depends on which ones.
13    Q.  How about this.  Which ones are you
14  prepared to talk about?
15    A.  I would have no idea which ones you were
16  going to ask questions on.
17    Q.  One of the allegations that Kansas
18  Counselors has made is that my client has failed
19  to join an indispensable party in this case.  Who
20  would that indispensable party be?
21    A.  I would have no idea.
22    Q.  Who would in your organization would have
23  that information?
24    A.  I do not know.
25    Q.  One of the allegations and affirmative

Page 26

1  defenses alleged by your lawyers is that
2  Plaintiff's damages, quote, if any, are the result
3  of Plaintiff's own conduct or the conduct of other
4  persons or entities.  Let's start with my client's
5  own conduct.  What conduct of his caused his
6  damages?
7    A.  Well, there's a -- a thing in place that
8  the credit bureaus have that if a consumer
9  disputes an item that's on their bureau, they can
10  file an -- report with the credit bureau, and that
11  would have solved an inaccurate report from the
12  credit bureau.
13    Q.  Would that have prevented Kansas
14  Counselors from still calling him on the debt?
15    A.  Well, I think if the investigation at the
16  time would have -- on his dispute through the
17  credit bureau would have yielded that he was not
18  the person that was owed, then there would be no
19  more contact with the customer.
20    Q.  Okay.  You're aware that in June of 2010
21  my client told one of your employees that he
22  didn't owe Shawnee Mission Physicians any money.
23  You're aware of that?
24    A.  Well, I'm not aware of the specific date,
25  but I am aware of the conversation, yes.

Page 27

1    Q.  Okay.  Are you aware that your collector
2  in June of 2010 still tried to get my client to
3  pay the debt, even after being told that my client
4  didn't owe it?
5    A.  I -- once again, without having the
6  actual notes in front of me, I couldn't
7  specifically talk about that.
8    Q.  Do you have any facts to refute that
9  allegation that even after my client apprized your
10  company in June of 2010 that he did not owe a debt
11  to Shawnee Mission Physicians, your company tried
12  to collect it from him anyway?
13    A.  And your question was, do I have any?
14    Q.  Any knowledge to refute that allegation?
15    A.  I don't have any knowledge to agree to it
16  or refute it, and without having the notes in
17  front of me.
18    Q.  Okay.
19       MR. KLUTHO:  Counsel, do we want to go
20  through this entire exercise and waste the time
21  without giving this gentleman the notes  cause
22  I'll give him the notes?
23       MR. WADDELL:  I'm going to give him the
24  notes, too.
25       MR. KLUTHO:  Because this is not a

Page 28

1  memorization test.  You're going about it
2  improperly.
3       MR. WADDELL:  Well, designees are
4  supposed to be prepared to give responses --
5       MR. KLUTHO:  He is 100 percent prepared
6  if you give him the notes.
7       MR. WADDELL:  All right.  We'll see about
8  that.
9       MR. KLUTHO:  And why you're doing this is
10  beyond me.  It borders on harassment of this
11  witness.
12       MR. WADDELL:  Okay.  We can take that up,
13  too.
14       MR. KLUTHO:  Yeah.  And I may need to
15  stop the deposition if you're going to continue
16  this way.
17       MR. WADDELL:  Okay.  All right.
18  BY MR. WADDELL:
19    Q.  The last affirmative defense also
20  references, Third parties over whom KCI had no
21  control and for which it is not responsible may
22  have caused my client's damages via actions or
23  inactions.  Who are those third parties?
24    A.  The credit bureaus.
25    Q.  Which ones?



Appino Biggs
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free:  888.273.3063
www.appinobiggs.com

(Main Office)                                      (Metro Kansas City)
Topeka, KS                                         Overland Park, KS
785.273.3063                                       913.383.1131

Page 37

1  zero.
2      A.  Those are employee or system-designated
3  individuals.
4      Q.  Okay.  Can you tell by those numerals
5  and/or numbers, letters who was responsible for
6  that inquiry?
7      A.  Yeah, we could.  SK is the system and
8  everybody else is an employee of ours.
9      Q.  Okay.  What about the second entry that
10  starts F4062410.  Do you see that?
11      A.  That would be the date.
12      Q.  Okay.  What about the first two, the F4?
13      A.  The first two characters?
14      Q.  Yeah.  It reads F4 and then zeros.
15      A.  That would be an employee-designated
16  code.
17      Q.  Do you know who F4 is?
18      A.  I don't have it memorized, but it does --
19  we do have a legend in our office that would
20  indicate who F4 is.
21      Q.  Who in your organization would know who
22  F4 is?
23      A.  Well, everybody.
24      Q.  You just don't know today?
25      A.  I just don't know today, yeah.

Page 38

1      Q.  Do you know the date reflected in that
2  entry?
3      A.  I'm sorry.  I don't understand the
4  question.
5      Q.  Yeah.  The second entry that starts with
6  F4 --
7      A.  Right.
8      Q.  -- it says 062410.  Is that June 24th of
9  2010?
10      A.  That's correct, yes.
11      Q.  At what, 5:57?
12      A.  Yeah, 1757, correct.
13      Q.  Okay.  Does this entry reflect that a
14  communication was made to my client about a debt?
15      A.  Yes, it is.
16      Q.  Okay.  Can we tell based on this document
17  to whom this debt was owed?
18      A.  Not based on this document, no.
19      Q.  Okay.  Do you agree that the entry
20  reflects that my client disputes that he owes a
21  debt in that entry?
22      A.  Yes, I would say that's accurate.
23      Q.  Do you know anything Kansas Counselors
24  did after June 24th of 2010 to verify whether or
25  not my client, Michael J. Martin, owed a debt?

Page 39

1      A.  Well, looks like the employee requested
2  validation of debt, and we requested the dispute
3  to be done in writing.
4      Q.  Where does it say that the debt was
5  verified?
6      A.  Well, it's asking for needs written
7  dispute continue collections.
8      Q.  So he would have to dispute in writing --
9      A.  That's correct.
10      Q.  -- that he wasn't the right person to be
11  collected upon?
12      A.  That's correct.
13      Q.  Okay.  Is that Kansas Counselors' policy?
14      A.  Written dispute?
15      Q.  Yeah.
16      A.  Yes, that's correct.
17      Q.  How did Kansas Counselors come up with
18  that policy?
19      A.  It's according to the Fair Debt
20  Collection Practices.
21      Q.  Which portion?
22      A.  The 30 days to dispute a debt.
23      Q.  So, if Kansas Counselors calls someone,
24  say the wrong Jason Smith, and a Jason Smith says
25  I don't owe you guys anything, it's your opinion

Page 40

1  that Kansas Counselors continue to call that Jason
2  Smith?
3          MR. KLUTHO:  Object to the form of the
4  question.
5      BY MR. WADDELL:
6      Q.  Is that your -- is that Kansas
7  Counselors' position?
8      A.  No, I don't believe that's our position
9  at all.  We would request that it be put in
10  writing so we could verify it with the client.
11      Q.  So, my client telling the organization
12  that he didn't owe the debt is not good enough
13  under the policies of Kansas Counselors?
14          MR. KLUTHO:  Object to the form of the
15  question.
16      BY MR. WADDELL:
17      Q.  Is that your testimony?
18      A.  That's correct.
19      Q.  Okay.  Can you turn to page KCI008?
20      A.  Did you say eight?
21      Q.  Yes, sir.
22      A.  Okay.
23      Q.  Do you see that history in the lower
24  third of the page?
25      A.  Yes, I do.



Appino & Biggs
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free:  888.273.3063
www.appinobiggs.com

(Main Office)                                      (Metro Kansas City)
Topeka, KS                                         Overland Park, KS
785.273.3063                                       913.383.1131

Page 45

1  there?
2      A.  Johnson County Wastewater.
3      Q.  Okay.  Do you know as of the printing out
4  of this document, looks like June 28th of 2013,
5  did my client owe Johnson County Wastewater money?
6      A.  Yes.
7      Q.  Okay.  And, what's the amount he owes?
8      A.  $197.57.
9      Q.  Okay.  Can you tell from this document
10  the residence that's owed on?  In other words,
11  other than Michael Martin, how do you know that my
12  client owes that bill?
13      A.  Well, the name at the top is Michael J.
14  Martin.
15      Q.  Okay.  You see it says for Michael Martin
16  in the lower portion under the account?
17      A.  Right.
18      Q.  So, it's -- it's Kansas Counselors
19  contention today that my client, Michael J.
20  Martin, still owes $197.57 to Johnson County
21  Wastewater?
22      A.  We believe so, yes.
23      Q.  Okay.  The next page KCI012 shows a
24  client name for Emergency Department Physicians,
25  correct?

Page 46

1      A.  That's correct.
2      Q.  And you would agree that as of June 28th,
3  2013, the records of Kansas Counselors, Inc. shows
4  that my client, Michael J. Martin, owes $79 for
5  medical treatment provided to an Ava Martin?
6      A.  That's correct.
7      Q.  Okay.  Do you have any facts to refute
8  the allegation that my client doesn't know an Ava
9  Martin?
10      MR. KLUTHO:  Objection, asked and
11  answered.
12      BY MR. WADDELL:
13      Q.  Do you have any of those facts?
14      MR. KLUTHO:  Move on.
15      BY MR. WADDELL:
16      Q.  You can answer.
17      MR. KLUTHO:  You already asked the same
18  exact question, Counsel.
19      MR. WADDELL:  I just want to know why my
20  client is still, according to Kansas Counselors,
21  responsible for a debt for someone he doesn't
22  know?
23      MR. KLUTHO:  That's a different question.
24      BY MR. WADDELL:
25      Q.  Do you know why that is?

Page 47

1      A.  Can you repeat the question?
2      Q.  Yeah.  Why does he owe a debt, my client,
3  for an Ava Martin if he doesn't know an Ava
4  Martin?
5      MR. KLUTHO:  And I'm just going to just
6  stop you for a minute.  I don't see this on the
7  list of questions, Counsel.
8      MR. WADDELL:  Defendant's claim notes and
9  business records regarding Michael Martin, No. 7.
10      MR. KLUTHO:  Right.
11      MR. WADDELL:  These are claim notes and
12  business records.
13      MR. KLUTHO:  Correct.
14      MR. WADDELL:  Right.  I'm asking him
15  questions about them.
16      BY MR. WADDELL:
17      Q.  Sir, is it the testimony of Kansas
18  Counselors, Incorporated that my client, Michael
19  J. Martin, owes a debt to Emergency Department
20  Physicians for Ava Martin?
21      A.  Well, until we receive information to the
22  contrary, this is the information that we have on
23  our screen.
24      Q.  Okay.  Is that a yes to my question?
25      A.  Until we receive other information, then

Page 48

1  I would say that the screen is still going to show
2  $79 outstanding.
3      Q.  What additional information would you
4  need from my clients, other than him telling you
5  he doesn't know an Ava Martin, to have your
6  records not show that he's responsible for it?
7      A.  Well, he would need to provide something
8  in writing to us saying that the money is not owed
9  by him and for us to do an investigation on it.
10      Q.  Okay.  Do you want him to pay that today,
11  the $79?
12      MR. KLUTHO:  Objection.
13      BY MR. WADDELL:
14      Q.  You want him to pay someone else's bill?
15      MR. KLUTHO:  Objection, argumentative.
16  Don't answer the question.
17      BY MR. WADDELL:
18      Q.  I need you to turn the page KCI15.  Do
19  you see the third entry there that says
20  2012/06/06?
21      MR. KLUTHO:  We all see that.
22      A.  Okay.
23      BY MR. WADDELL:
24      Q.  And then it says 1605.
25      A.  Okay.



Appino & Biggs
Reporting Service, Inc.
Technology Specialist on Todays Litigation

(Main Office)
Topeka, KS
785.273.3063

Toll Free:  888.273.3063
www.appinobiggs.com

(Metro Kansas City)
Overland Park, KS
913.383.1131

9/26/2013                   CAMERON HAJI-KARIM                              19

Page 73

1   gentleman right here owes to the clients of Kansas
2   Counselors, Inc.?
3       A.  That is correct.
4       Q.  Okay.  Now, that you've reviewed the file
5   materials and claim notes, can you opine about
6   the factual basis for the affirmative defenses
7   asserted in this case?
8       A.  Anyone in particular?
9       Q.  Yeah.  How about, let's start with
10  failure to mitigate.  What facts do you have to
11  support that my client failed to mitigate his
12  damages here?
13      A.  Well, because the other accounts that are
14  outstanding on the account have not been disputed
15  formally by your client.
16      Q.  Okay.  How about estoppel?  Do you have
17  any facts to support the affirmative defense of
18  estoppel?
19      A.  Well, once again, he hasn't provided any
20  proof that the debt's outstanding or not
21  outstanding.
22      Q.  Other than him telling you and your
23  company that he doesn't owe it?
24      A.  The particular debt that he talked about
25  and he sent a letter on, we actually did take

Page 74

1   action on that account, and that was resolved and
2   handled.  But those other two debts that are
3   outstanding that we don't have any letter making
4   references to them.  But his letter that he
5   references here it's talking about a specific
6   account that was on his bureau.  That was
7   investigated, researched and handled.  But the
8   other accounts that he owes, we don't have any
9   information whether it's truly him or not based on
10  any information that he would have given us.
11      Q.  How about waiver?  Any facts that support
12  that affirmative defense, how my client's waived
13  these claims?
14      A.  Well, once again, we have -- don't have
15  anything in writing from him stating that he owes
16  or doesn't owe it or any fact that he lived or
17  didn't live or didn't have any information to
18  that.
19      Q.  Do you believe -- or does Kansas
20  Counselors know whether or not the Kansas Consumer
21  Protection Act applies to that?
22          MR. KLUTHO:  Object to the form of the
23  question, legal conclusion.
24      BY MR. WADDELL:
25      Q.  Do you know?

Page 75

1       A.  I think in certain situations, yes, it
2   would.
3       Q.  What situations are those?
4       A.  Specifically, all of them?  I wouldn't be
5   able to give you specifically all of them.
6       Q.  How about you tell this jury any?  Any
7   situations in which --
8          MR. KLUTHO:  Let's not.  Because two
9   things, it's a legal conclusion and it's not a
10  question asked for that this witness was asked to
11  be here for.  He's not going to answer it.
12      BY MR. WADDELL:
13      Q.  What policies and procedures does Kansas
14  Counselors, Incorporated utilize to avoid
15  liability under the Kansas Consumer Protection
16  Act?
17          MR. KLUTHO:  I'm going to object as to
18  relevancy.
19      BY MR. WADDELL:
20      Q.  You can answer.  Are there any procedures
21  and policies that your organization implements to
22  avoid liability?
23      A.  I'm sure there's a lot of procedures and
24  policies we have in place to avoid any infractions
25  of the law.  But I would need to know specifically

Page 76

1   what law you're talking about so I can tell you
2   what's
3       Q.  It's called the Kansas Consumer
4   Protection Act.
5          THE REPORTER:  Excuse me.
6          MR. WADDELL:  Sure.
7       BY MR. WADDELL:
8       Q.  The action is called --
9          THE REPORTER:  No.  I need you to finish
10  your question, then you --
11          MR. KLUTHO:  The question.
12          THE REPORTER:  -- your question.
13      A.  I would need to know specifically which
14  ones you are referring to.
15      BY MR. WADDELL:
16      Q.  Have you ever reviewed the Kansas
17  Consumer Protection Act?
18      A.  No, I have not.
19      Q.  Wouldn't you think it would be prudent
20  for the director of operations of a debt collector
21  in Kansas to know the laws that govern consumer
22  protection in the state of Kansas?
23          MR. KLUTHO:  Object to the form of the
24  question, argumentative.
25      A.  The laws that I'm familiar with are the



Appino & Biggs
Reporting Service, Inc.
Technology Specialist in Todays Litigation
Toll Free:  888.273.3063
www.appinobiggs.com

(Main Office)
Topeka, KS
785.273.3063

(Metro Kansas City)
Overland Park, KS
913.383.1131

Page 77

1  Fair Debt Collection Practices Act and HIPAA.
2      BY MR. WADDELL:
3      Q.  Do you have any knowledge as an
4  organization on whether or not the Kansas Consumer
5  Protection Act applies to debt collection?
6      A.  I would have to say some of it probably
7  would spill over to debt collections, but I'm sure
8  the Fair Debt Collection Practices would also
9  protect the consumer as well.
10     Q.  Do you know whether or not any body
11  within Kansas Counselors, Incorporated has ever
12  reviewed the Kansas Consumer Protection Act?
13     A.  I would not be able to answer that
14  question.
15     Q.  Who within your organization would know
16  that?
17     A.  I would not know the answer to that
18  question.
19     Q.  But your testimony as director of
20  operations, that you personally have never
21  reviewed the Kansas Consumer Protection Act?
22     MR. KLUTHO:  Objection.  Cruelty to
23  animals, beading a dead horse.  Asked and
24  answered.
25     BY MR. WADDELL:

Page 78

1      Q.  You can answer.
2      MR. KLUTHO:  He's already answered.
3      BY MR. WADDELL:
4      Q.  The answer is no, correct?  You've never
5  reviewed the Kansas Consumer Protection Act, true?
6      A.  I've already answered that question, no
7  --
8      Q.  The answer is true?  One more time.
9      A.  No, I have not reviewed it.
10     Q.  Do you have any intent moving forward to
11  review the Kansas Consumer Protection Act as the
12  director of operations of Kansas Counselors
13  Incorporated?
14     MR. KLUTHO:  Don't answer that question.
15  It's a ridiculous question, all right?
16     MR. WADDELL:  Okay.
17     BY MR. WADDELL:
18     Q.  Do you also feel for this jury that it's
19  ridiculous for me to ask whether or not you as
20  director of operations --
21     MR. KLUTHO:  Counsel, I'm going to stop
22  the deposition?
23     MR. WADDELL:  Okay.  Are you asking him
24  -- or instructing him not to --
25     MR. KLUTHO:  I am.  Ask questions about

Page 79

1  this lawsuit.
2      MR. WADDELL:  I am --
3      MR. KLUTHO:  Don't ask about what this
4  client is going to do going forward in the future.
5      MR. WADDELL:  Okay.  I'm going to move to
6  strike and let it be known at this time I'm going
7  to be asking for a financial sanctions as a result
8  of your instructing your client not to answer that
9  reasonable question.
10     BY MR. WADDELL:
11     Q.  I'm going to give you one more
12  opportunity to answer --
13     MR. KLUTHO:  Go ahead.  Move -- move for
14  sanctions.
15     MR. WADDELL:  Okay.
16     BY MR. WADDELL:
17     Q.  As you, a director of operations for
18  Kansas Counselors, Incorporated -- do you have any
19  intent in the future to review the Kansas Consumer
20  Protection Act to make sure Kansas Counselors is
21  compliant with Kansas law?
22     MR. KLUTHO:  Don't answer the question.
23  That's an abusive question.  It's an improper
24  question.
25     And you know it is, Counsel.

Page 80

1      BY MR. WADDELL:
2      Q.  Would you agree, generally speaking, that
3  an organization might be better equipped to comply
4  with laws if they actually read them?
5      MR. KLUTHO:  Don't answer the question.
6  It is not within the scope of the requests of this
7  witness, Counsel.
8      MR. WADDELL:  No further questions.
9      MR. KLUTHO:  Mr. Karim will review and
10  sign the deposition.
11     THE VIDEOGRAPHER:  It is 11:49 a.m.
12  Going off the record.  This concludes the
13  deposition.
14     (THEREUPON, the deposition concluded at
15  11:49 a.m.)
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Appino & Biggs
Reporting Service, Inc.
Technology Specialist in todays Litigation

(Main Office)
Topeka, KS
785.273.3063

Toll Free:  888.273.3063
www.appinobiggs.com

(Metro Kansas City)
Overland Park, KS
913.383.1131